county, after ancillary letters have been issued by the surrogate of that county, though without a citation to the county treasurer as required by law.

Motion in the matter of the estate of Francis Hathaway, deceased, to vacate the appointment of a transfer-tax appraiser in the county of Chemung by the surrogate of the county of New York. Motion sustained.

T. Frank Brownell, for the motion.
Emmet R. Olcott, opposed.

VARNUM, S. This matter was originally submitted to Surrogate Arnold, and subsequently, after reargument, submitted to me. The decedent, who was a nonresident, died in 1895, leaving property in the county of Chemung, and also in the county of New York. Ancillary letters were obtained in the former county, but without citation to the county treasurer as required by law. In August, 1895, on application by the comptroller of the county of New York, a transfer-tax appraiser was appointed in that county. The present motion is made to vacate such appointment, on the ground that the surrogate of this county had no jurisdiction to make the order. In reply, it is urged that the jurisdiction of both surrogates to issue ancillary letters of administration and to enforce the transfer tax was originally concurrent, and that the failure on the part of the surrogate of Chemung to cause the county treasurer to be cited, while only an irregularity, so far as the validity of the ancillary letters themselves are concerned, nevertheless caused him to fail to obtain jurisdiction for transfer-tax purposes. The surrogate of New York was, therefore, according to this contention, the first surrogate to obtain jurisdiction for such purposes when he made the order sought to be vacated. This claim cannot, I think, be maintained. Section 10 of chapter 399 of the Laws of 1892 furnishes the law applicable to the matter, and makes jurisdiction to assess the transfer tax thereunder depend upon jurisdiction to grant letters testamentary or of administration, or to "give ancillary letters," etc. The surrogate of Chemung county having issued ancillary letters, although there appears to have been irregularity in the proceeding, the surrogate of this county would have no jurisdiction to issue them. Code Civ. Proc. § 2477. He therefore would have no jurisdiction for transfer-tax purposes, and the application to vacate the order appointing an appraiser is granted.

Application granted.

---

(27 Misc. Rep. 401.)

In re FLAGG'S ESTATE.

(Surrogate's Court, Cattaraugus County. May, 1899.)

1. NOTES—FRAUD—CONFIDENTIAL RELATIONS—PARENT AND CHILD.
    The mere fact that a son had been the adviser and assistant of his aged father in business affairs for many years does not raise the presumption that a note executed by the father to the son during such time was obtained by fraud or undue influence.

**2. SAME—CONSIDERATION.**
  A valuable consideration, though wholly inadequate, is sufficient to support a note.

**3. SAME.**
  An elder son and his family lived nearer the testator than the other sons, and did much more for him than the other sons. The testator gave said son a note for $500, expressed to be for value received. Several witnesses testified that the testator had said that he intended to pay the elder son for all his work, and he had referred to his intention to make such compensation when services had been performed for him by the members of the family of such elder son. *Held*, that a valuable consideration for the note is shown.

In the matter of the judicial settlement of the estate of David Flagg, Sr., deceased. A personal claim of the executor allowed.

T. H. Dowd and J. J. Inman, for executors.
James H. Waring, special guardian, for contestants.

DAVIE, S. The only controversy in this proceeding relates to the personal claim of the executor, David Flagg, Jr. He seeks to recover from the estate the amount of a promissory note made by testator, dated July 19, 1893, for $500, payable to the order of the claimant at the demise of the testator; also, for services rendered testator after the date of the note. The testator died at the town of Elko September 13, 1897, leaving a last will and testament, which was admitted to probate January 3, 1898, by which he bequeathed to the claimant $100, and, after several other unimportant, bequests directed the rest and residue of his estate to be divided into seven equal shares, one of which he bequeaths to the claimant, one to each of four other sons, one to the daughter, one-half of a share to another son, and the remaining one-half share to certain grandchildren. The will empowered the executors to sell the testator's real estate, which was accordingly done; and the total amount of the estate, as shown by the accounts filed, is about the sum of $5,000.

We will first consider the claim upon the note. Although the testator was advanced in years, and somewhat physically enfeebled, at the date of the note, there is no suggestion from the evidence, direct or inferential, that testator was incompetent to make the same, or that its execution was obtained by fraud or undue influence. There is some proof, which will be more particularly hereafter referred to, tending to show that testator was, and for many years had been, dependent upon the claimant for advice and assistance in his business affairs; and it is urged in opposition to the validity of the note that the legal presumption of constructive fraud arises from such relations. While it is undoubtedly true that this presumption prevails where certain relations exist, like guardian and ward, trustee and cestui que trust, imposing upon the claimant the burden of showing affirmatively that all was fair and honest, yet such presumption is not applicable to a case like the one under consideration. "While the doctrine is, without doubt, to be extended to many other relations of trust, confidence, or inequality, the trust and confidence, or the superiority on one side and weakness on the other, must be proved in each of these cases. The law does not pre-

sume them from the fact, for instance, that one party is a grandfather, and old, and the other a grandson, and young, or that one is an employer and the other an employé. The question as to parties so situated is a question of fact, dependent upon the circumstances in each case. There is no presumption of inequality either way from these relations merely." Cowee v. Cornell, 75 N. Y. 100, 101. There being no proof or presumption to the contrary, the issues involved in this contest must be determined on the assumption that this note represents the intelligent and untrammeled desire and intention of the testator.

It is claimed on the part of the contestants that the note was executed entirely without consideration,—an attempted but ineffectual testamentary provision; in other words, that it was intended purely as a gift. If such contention is sustained by the evidence, the claimant is not entitled to recover. Pearson v. Pearson, 7 Johns. 26; Harris v. Clark, 3 N. Y. 93; Holmes v. Roper, 141 N. Y. 64, 36 N. E. 180. "A promissory note is but the promise to pay money in the future, and, if made and delivered purely as a gift, is without consideration, and cannot be enforced, at law or equity, either against the maker, or against his estate after his death, except in the hands of a bona fide holder for value, without notice of the want of consideration. Such a note is but a promise to make a gift in the future, and the gift is not completed till the note is paid. It can be revoked any time before payment, and death will revoke it." 8 Am. & Eng. Enc. Law, 1320. If, however, the note was given for a valuable consideration, it is enforceable against the estate. Mere inadequacy of consideration does not constitute a defense. Worth v. Case, 42 N. Y. 362; Earl v. Peck, 64 N. Y. 596; Cowee v. Cornell, 75 N. Y. 91.

In the case of Worth v. Case, above cited, the action was brought to recover against the estate of the maker the amount of a note in the following form:

"Addison, January 30th, 1864.

"I promise to pay my sister, Mary C. Worth, on demand, ten thousand dollars, in consideration of services rendered to me.          T. B. Worth."

In that case the evidence established the fact that the claimant had rendered certain services for the maker, but it was entirely apparent that the value of such services was far less than the amount of the note. The court, in the opinion, at page 369, says:

"To support a note or other contract, it is not necessary that the consideration therefor shall be equal in pecuniary value to the amount of the obligation incurred by the note or contract. It is enough, generally, that no part of the consideration upon which it was founded was wanting at the time the obligation was incurred, and that no part of it has subsequently failed. * * * If one voluntarily and fairly purchases either real or personal property of another at a fixed price, and executes his note for the payment of the purchase money, he will not be allowed, when sued thereon, to prove, for the purpose of defeating or reducing the amount of the recovery on the note, that the property in fact was not worth one-half or one-quarter, or even one-tenth, the amount at which he purchased it."

This case is cited, and the principle therein enunciated, in the case of Earl v. Peck, above cited, which was an action upon a note, of which the following is a copy:

"$10,000. For value received, I promise to pay Mary Earl, for services rendered, ten thousand dollars.

"Stanford, October 12, 1873.                                    George Peck."

In the opinion, the court says:

"The note is for $10,000, and expresses the consideration to be for services rendered. The plaintiff had been the housekeeper for the defendant, who was a bachelor, for seven or eight years, and the latter was indebted to her for her services in some amount; and the evidence tended to prove that, at some time during the service, it was agreed that the amount of compensation should be left to the intestate. Mere inadequacy of consideration, except as a circumstance bearing upon the question of fraud or undue influence, is not a defense to a note. It is not necessary that the consideration of a note shall be equal in pecuniary value to the obligation incurred."

In the case of Worth v. Case the court also recognizes the fact that a note given for services to be rendered in the future is based upon a valuable consideration, if such services are rendered; for the court, in the opinion, at page 370, says that it might be that the maker of the note desired to stimulate the efforts of the payee in his behalf by means of a pecuniary consideration.

Under these authorities, which merely announce and apply principles entirely elementary, if the evidence in this case shows that the note under consideration was executed and delivered for some valuable consideration, it is a valid and enforceable obligation, and it was not incumbent upon the claimant to establish a consideration commensurate in value with the amount of the note. A valuable consideration, although entirely inadequate, is sufficient. So the question resolves itself simply into this: Does the evidence satisfactorily show that this note was given for a valuable consideration? And the determination of this question necessitates a careful analysis of the evidence bearing on this proposition. The evidence on behalf of the contestants consists almost entirely of proof of statements and declarations on the part of the claimant in regard to the circumstances attending the execution of this note; and it will be well to remember, in this connection, that courts have frequently had occasion to denominate evidence of this character as weak and unsatisfactory. The witness William Flagg, who is a son of testator and one of the residuary legatees, and whose interests are for that reason antagonistic to the claim of the claimant, testified to having had a conversation with the claimant after the death of the testator, in which, as he says, the claimant said to him:

"One thing, father kept his business up straight, and did not owe anybody anything, without it was Leonard for a little board. Anyway, he didn't owe me anything."

This witness further testified that, after he learned of the existence of the note in controversy, he had a further conversation with the claimant in regard to it, and he asked the claimant how it was that the testator owed him, and had given him his note; how he had done so much business for his father, and his father had given him his note, and nobody knew it but himself; and, in this connection, the witness testifies that the claimant said:

"I did not do business for him. He gave it to me. It was a gift."

The witness David Wright, who is also one of the residuary legatees, testified that he had heard the claimant say that the testator did not owe him anything, and that he did not owe anyone anything, unless it was Leonard a little for board.

The witness Amos Flagg, another son and legatee, testified that the claimant said to him that he did have a note against his father's estate for $500, and that he could have had $1,000 just as well, and that his father did not owe him; that it was a gift.

The witness Blackburn testified to having had two conversations with the claimant, in one of which he says the claimant told him this note was given him as a present, and in the other that it was given to him for services rendered.

Della Flagg, who is the wife of one of the sons and residuary legatee, says that the claimant, in explaining to her the circumstances under which the note was given, said:

"That he [the testator] wished to do better by him than he had the rest, and I asked him why he did not put it in the will, and he said the other brothers would have made it so unpleasant for him he could not have stood it; and I said I did not know the will was to be exhibited to the whole family."

The witness Stewart, in detailing a conversation which he had had with the claimant in regard to this note, said:

"I can't tell just what he said. I know he was telling about the note, and he said his father said he wanted to give him more than he did the rest, because he had always done more for him than the rest of his sons; that his father said, if there was any way he could fix it so he could give him more, he wanted to, and said he went to Randolph, and saw Judge Henderson, and told him, if he could give him any way to do it, he would like to have him; and that Judge Henderson drew up the note, and he came home, and copies the note, and took it over, and his father signed it; it was all right, and he signed it."

On his cross-examination this witness further testified as follows:

"Q. He said the reason his father wanted to give him this $500 was because he had done more for him than the other children? A. Yes, sir. Q. And the $500 was to pay him for what he had done for him more than the other children? That was your understanding? A. That was what he said."

That was the principal evidence relied upon by the contestants, and it will be observed that the declarations made by the claimant to the effect that his father had given him this note for services rendered or for what he had done for his father may be eliminated from consideration, because such statements were in no sense inconsistent with the position of the claimant. In fact, that is precisely what the claimant is now urging,—that this note was given to him for such services.

Upon the part of the claimant, it appears from an inspection of the note that it expresses a valuable consideration; that it states that it was given for value received. In view of the fact that the giving of this note was the intelligent and voluntary act of the maker, who had full knowledge of the character and extent of his obligation to his son, this statement is entitled to some consideration in determining the question at issue. It is the written declaration of the testator that he had received value from his son, and that he himself estimated the amount thereof at the sum of $500. The claimant denies making the statements or admissions testified

to by some of the witnesses,—especially those claimed to have been made to the witnesses Amos Flagg, Stewart, William Flagg, and Della Flagg. The wife of the claimant testifies that she was present at the time of the conversation between her husband and Amos Flagg, and that she was in a position to hear what was said between them, and that her husband did not state in that conversation that the testator did not owe him anything, or that this note was a gift to him. The other evidence in this case inferentially and directly, to some extent, supplements the proof of value admitted by the statement in the note.

The witness Snover had been the family physician of the testator for many years, and during that time had visited at his place both before and after the execution of the note; and he testifies that, on the occasion of his visits at the house, he generally found some of the claimant's family there,—David or his wife. He testified as follows:

"Q. Did you ordinarily, when called there, find some one there with the old people? A. Yes, sir. Q. Who, ordinarily? A. Some of David's people were generally there. Q. Who of them? A. David or his wife. Q. Somebody have something to do about the care of them while you were there treating them? A. Certainly. Q. Who, generally? A. Of course, there were David and his wife a good share of the time, and sometimes there were others there."

The witness Nancy Flagg, who is the wife of the claimant, testified that she has known the testator for a period of 28 years, and that during the greater part of the time the testator was in an enfeebled condition physically; that in the month of June, 1892, he was assaulted and robbed, and that at that time the testator was living on a small piece of land near the residence of her husband; and that she was at the residence of the testator a good deal of the time, and that the other children lived considerably farther away. She details to some extent the nature and character of the services rendered and attention given by her husband to the old people. She testified, as follows, among other things:

"Q. Did you ever hear David, Sr., say anything, before the 19th day of July, 1893, in reference to your boys staying there with them? A. I have. Q. What did he say? A. Said he didn't know what he would do if it wasn't for our boys staying there; couldn't get any of the others to stay there and do their work: they couldn't stay there alone. Q. What, if anything, Mrs. Flagg, have you heard David Flagg, Sr., say upon the subject of David, Jr., and your family getting paid for this work you have been speaking of? A. Have heard him make the remark a good many times that we were the ones that did more for him than any of the rest of the family, and we should be paid. He said David should be well paid for all he had done for them. Heard him say that a good many times."

In speaking of the circumstances under which this note was executed, she testified as follows:

"Q. When did you first see it [the note]? Who had it? A. David had it in his possession. Q. Where was it when you first saw it? Where was he? A. He came home and brought it. Q. You first saw the paper at your home? A. Yes. Father was at our house first, and said he wanted David to come over; said the other boys had been down and raised the devil, and mother had gone and left him alone, and said he was heartbroken, and said he wanted David to go over to his house,—he had got some business with him. Q. Did he go?

A. Yes. Q. How long was he gone? A. Not very long. Q. Then he came back and brought this paper? A. Yes."

### She further testified as follows:

"Q. You say David and his father talked some about pay. When was the last time you ever heard them talk anything about it? A. The Tuesday he was taken sick at our house. He was talking about it then, and he said we should be well paid for what we did, for he said if it hadn't been for us he could not have lived there on the place. Q. You say on this day the old gentleman came down there he was sick, and that he said that you and David had done more for him than any of the rest. I wish you would state fully what he said on that day. A. He was talking about the way he came to come down: that Leonard and his wife were going away. He said we should have our pay in full for everything we had done; that we were the only ones he could get to do anything for him, that he could rely on. He said the other boys, every time he wanted them to do anything for him, were busy and couldn't do it, and had their own work to do. He said, whenever he wanted anything done, they would say: 'You get David and his folks to do it for you. David has got you down there, and they can care for you.' Q. State what you have heard Mr. Flagg, the deceased, say on the subject of paying David and his family for work that was done there by them for him. A. He said that David had always done more for him than all the rest of them, and he had always relied on him to do his business for him in every way,—because he was the oldest. he had relied on him to do his business. Said the rest didn't want to do anything for him, and, if they did, they wanted their pay; that William wouldn't do anything for him, and would go by, and, if they asked him if he was going to the river, he wouldn't answer. I have heard him say several times that David should have his pay,—David and his family; that he had plenty, and they should have their pay for it."

The witness Francis J. Flagg, who is a son of the claimant, testified that on one occasion, with his father's team, he drew some lumber for the testator; that the testator paid him less for his services than what he was earning in other places, and, by way of explanation, said that:

"Father didn't charge anything for the team, as he had an arrangement with him whereby he would get his pay later."

The witness Emery Flagg, who is a minor son of the claimant, testified that he had rendered services for the testator, and was asked the following:

"Q. Did your grandfather ever say anything to you on the subject of whether or not you or anybody else should be paid for your work there? A. He has. Q. Tell what he has said to you on the subject. A. He has told me that the time would come when I would get every cent that belonged to me,—either myself or my father. He told me that a good many times."

Jennie Flagg, a daughter of the claimant, was asked:

"Q. Did you hear your grandfather say anything about owing your people for this work? A. I have. Q. Tell what you have heard him say on the subject. A. Said, 'You have all been very good to me, and done a good deal for me, and you shall, some day, have your pay for it.'"

There is much more evidence in the case, to which I have not referred specifically, showing the rendition of services on the part of the claimant and his family for the testator after the date of the note, and showing quite definitely the character of such services; and, while such proof relates to a period subsequent to the making of the note; it is entirely apparent from the circumstances and surroundings that the treatment of the testator by the claimant and

his family was substantially the same after the making of the note as before. It is entirely apparent that in view of the fact that the claimant was the eldest son, and lived nearer than the other children, and always willing to care for his father and mother, his father had for years relied upon him and his family for such attention and services as they required; and I am entirely satisfied that, in the making of the note in controversy, the design of the testator was to compensate the claimant for services which had theretofore been rendered,—services necessary to the testator, and valuable in their character,—as well as to stimulate the claimant to a continuance of such attention and services during the balance of the life of the testator. This being the case, the evidence, in my opinion, shows a valuable, and, it occurs to me, an ample, consideration for the note; that the testimony of the witness Amos Flagg, and of the other witnesses who asserted that the claimant had said to them that the note was not given for services, that the testator did not owe the claimant, and that the note was a gift, in no way correctly represents the actual circumstances under which said note was given. The claimant is entitled to recover upon this note the amount thereof, with interest from the date of the death of the testator.

In regard to the balance of the claim, the conclusion which I have reached in regard to the nature of the consideration for this note almost necessarily precludes the right to recover for such services as were rendered by the claimant and his family to the testator after the date of the note. As already indicated, I am of the opinion that the giving of the note by the testator, and its acceptance by claimant, were with the mutual intent and understanding that it was to be full compensation for all services theretofore rendered and which might be thereafter rendered. Even if this were not true, the evidence in regard to the character and extent of such services and their value is altogether too vague and indefinite upon which to base a fair estimate of their pecuniary value. That part of the claimant's claim should therefore be disallowed. A decree will be accordingly entered. Decreed accordingly.